**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**STEVEN RIPSTRA**
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| JANE KLEAVING, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 74A04-1209-CR-472 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE SPENCER CIRCUIT COURT
The Honorable Jon A. Dartt, Judge
Cause No. 74C01-1111-FA-245

**September 11, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Jane Kleaving ("Kleaving") appeals her conviction for conspiracy to commit murder as a Class A felony,[1] raising the following three restated issues:

I.      Whether the State presented sufficient evidence to support the conviction;

I.      Whether the trial court erred when it excluded Kleaving's proffered evidence that she suffered from diminished mental capacity; and

III.    Whether Kleaving's thirty-year sentence was proper.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Kleaving and her husband, Kevin, are the parents of Laura, who has a daughter, A.K., born in January 2006. A.K.'s father is Kyle McPherson ("McPherson"). Laura, McPherson, and A.K. lived with Kleaving and Kevin at their home in Tell City, Indiana, for several years, starting in late 2004 or early 2005. McPherson's job as a boilermaker required him to travel and be gone for weeks at a time, and Laura worked and took college courses; while A.K.'s parents were gone, Kleaving was her primary caregiver.

The facts most favorable to the jury's verdict show that in April 2006, a few months after A.K.'s birth, and without McPherson's knowledge, Kleaving and Kevin filed for a temporary guardianship of A.K, which may have been intended for the purpose of acquiring health insurance for the child.[2] In any event, relationships deteriorated, and in June 2008,

---

[1] *See* Ind. Code §§ 35-42-1-1, 35-41-5-2.

[2] The affidavit filed with the court in support of service by publication of the guardianship petition stated that "[t]he exact whereabouts of [McPherson] is not known," although McPherson was living with Kleaving at her residence at the time. *Tr*. at 698-99.

McPherson permanently moved out of Kleaving's residence. McPherson learned about the guardianship proceedings in late 2008 or early 2009. In December 2008, McPherson filed a paternity action to establish his fatherhood of A.K. and establish visitation with her. Extensive litigation ensued, including various allegations that McPherson abused A.K. Multiple allegations of abuse were lodged against McPherson, but they were not substantiated. The trial court ordered that McPherson have supervised visitation with A.K., and McPherson sought to modify the order to gain joint custody.

Kleaving continued to harbor the belief and concern that McPherson was abusive to A.K., and she became increasingly protective and possessive of A.K. In early 2010, Kleaving obtained a psychic reading from a paranormal consultant and life coach named Rich Hayes ("Hayes"). Hayes told Kleaving he was concerned about A.K. and her safety and, based on his future predictions, if things did not change, A.K. would kill herself before the end of 2012. In an effort to help Kleaving, Hayes introduced Kleaving to Kathy Griepenstroh ("Griepenstroh"), who was a massage therapist and reflexologist, but who also conducted private investigative work, often at no charge. Kleaving and Griepenstroh became close friends. Kleaving told Griepenstroh that McPherson was abusing A.K., and Griepenstroh agreed to help Kleaving investigate the matter. Griepenstroh began following and videotaping McPherson during his visits with A.K. Kleaving began to convince Griepenstroh that McPherson was abusing A.K., and Griepenstroh increased her involvement on Kleaving's behalf by contacting child protective services, law enforcement, television stations, child advocacy groups, the Governors' offices of Indiana and Kentucky, and

3

Michelle Obama. Kleaving talked with Griepenstroh about the abuse "[a]ll the time" in front of A.K., as well as her dislike for McPherson. *Tr.* at 1002. At some point, Kleaving told Griepenstroh that she wished McPherson would die.

Eventually, in September 2010, Kleaving asked Griepenstroh to kill McPherson for her. "You love [A.K.], kill [McPherson] for her." *Id.* at 1003, 1006. Griepenstroh refused and advised Kleaving that it was "so wrong," but Kleaving stated that she did not care and would talk to other people to accomplish it. *Id.* at 1003.

At some point, Kleaving contacted a long-time family acquaintance, Jeff Schneider ("Schneider"), and told him she believed McPherson was abusing A.K. and that a psychic had told her that McPherson was going to make A.K. disappear. Kleaving indicated she would personally make McPherson disappear if she could get away with it. Although he made reference to the idea that she could stage a hunting accident, Schneider encouraged Kleaving to let the court system handle the situation.

Around the same time frame, Kleaving asked Griepenstroh to find a hit man for her. Griepenstroh agreed but privately intended, at this point, to contact the authorities. In order to have cell phones not associated with her name, in September 2011, Kleaving contacted her cousin, who lived in Florida, and asked her to purchase and mail a GoPhone to Griepenstroh, which the cousin did.

On September 13, 2011, Griepenstroh contacted authorities, who upon investigation, determined that Kleaving posed a threat to McPherson. The Jasper Police Department contacted Sergeant Steven Sands ("Sergeant Sands") of the Indiana State Police for

assistance with the murder-for-hire investigation. Griepenstroh provided the Florida GoPhone to Sergeant Sands, who it was decided would pose as a contract killer, and Griepenstroh provided the authorities with Kleaving's TracPhone number, which had a Texas area code. On Tuesday November 8, Sergeant Sands, using the GoPhone and identifying himself with the fictitious name of "Vic," contacted Kleaving on her TracPhone. *Tr.* at 529. Kleaving confirmed she was expecting his call. Sergeant Sands suggested that they meet, and Kleaving replied, "where and when?" *Id.* at 601. Sergeant Sands suggested that they meet two days later, on Thursday, at the Troy Boat Ramp, but Kleaving said that Thursday was not a good day, so Sergeant Sands suggested that they meet on Friday (November 11). He told Kleaving he would need a picture of McPherson and an address for him. When Sergeant Sands suggested that they meet at 9:00 a.m. at the boat ramp, Kleaving asked Sands if he could wait until after the paternity court ruling regarding custody and visitation, and he told Kleaving it was her decision and, in fact, noted she might not have to go through with it if the judge made some sort of ruling. *Id.* at 603; *State's Ex.* 12 at 11. Kleaving reiterated that she wanted "him" to go away, never ever come home and never be found. *State's Ex.* 12 at 12. Later that night, Kleaving talked to Griepenstroh, telling her that she had arranged to meet the hit man on Friday and pay him $500, but she had changed her mind. Griepenstroh told Kleaving she was pleased to hear that Kleaving had changed her mind.

However, on the morning of Friday November 11, Kleaving called Sergeant Sands. She requested to change their meeting location from Troy Boat Ramp to Lincoln Ferry Park at 11:00 a.m. because she was concerned that Kevin was working in the area of the boat

5

ramp. She gave Sergeant Sands directions to Lincoln Ferry Park. At 11:00 a.m. Sergeant Sands proceeded to Lincoln Ferry Park. Kleaving was already there and waiting in her vehicle when he arrived. Sergeant Sands pulled his vehicle next to hers, and he invited Kleaving to sit in his vehicle, which she did. Sergeant Sands had three recording devices in operation. Kleaving handed Sergeant Sands a sealed envelope containing $500 in cash, a photograph of McPherson, and computer printout of information about McPherson. She advised Sergeant Sands where McPherson was working, and she described the vehicle he drove.

Kleaving told Sergeant Sands, "I don't have a lot of money because I've spent it all on investigators," to which Sergeant Sands responded, "[I]t's going to cost you 10, plus the expense money." *State's Ex*. 13 at 9. Kleaving asked if he could come down in price or even do it for free, and he replied he would not. Kleaving offered her Yukon vehicle as $3,000 partial payment, which was acceptable to Sergeant Sands. She then retrieved the Yukon title and gave it to Sergeant Sands. During the conversation, Sergeant Sands suggested that, to obtain the remaining $6,500, they could stage a burglary at Kleaving's residence, where he would steal items the value of which he would apply toward the remaining money owed. Kleaving could later seek insurance money to cover the theft. Kleaving agreed and stated she would contact him with a date when she was certain no one would be home. She also indicated she would unlock the gun safe in the basement for him so that its contents could easily be accessed.

6

At one point, Kleaving expressed her thoughts that perhaps they should wait to learn the court's ruling regarding custody and visitation before taking further steps; Sergeant Sands responded that the decision if and how to proceed was hers, but noted he could not wait a month or else it would cost her more since he would need to travel back to Texas and then return to Indiana. Kleaving did not end the meeting or further indicate her desire to terminate the plan. Rather, Kleaving talked at length about her belief that McPherson had abused A.K., that the psychic had said A.K. would commit suicide in the year 2012, and that she was convinced McPherson would eventually harm or kill A.K. While Kleaving stated she did not want to know the details of how McPherson was killed, and just wanted him to go away and never be seen again, she told Sergeant Sands to cut off McPherson's penis and "stick it up his ass" and suggested that McPherson's body could be dumped at the Addison Dam. *Id*. at 6, 23-26, 30. Their meeting concluded with Sergeant Sands advising Kleaving he would be waiting to hear from her, and she stated, "I'll call and tell you when." *Id.* at 49. Kleaving was arrested as she left.

The State charged her with Class A felony conspiracy to commit murder and Class D felony conspiracy to commit insurance fraud. Prior to trial, the State filed a motion in limine to exclude the testimony of Dr. Thomas Holsworth, Ph.D. ("Dr. Holsworth"), who met with Kleaving in January 2012, two months after her arrest and while she was incarcerated, and performed a psychological evaluation. The State argued that the report was prepared after Kleaving's incarceration and was not relevant to her state of mind at the time of the offense and, further, was prepared for legal purposes, not for her diagnosis or treatment; thus, the

alleged hearsay and self-serving statements were not admissible under any hearsay exception. The trial court took the motion under advisement, but prior to trial, it granted the motion "for trial purposes," stating that the doctor's testimony and report were not admissible at trial, but that it might be admissible at sentencing and would be considered at that time. *Tr.* at 344.

Kleaving asserted the defense of entrapment, and the jury was instructed on the defense in both preliminary and final instructions. *Appellant's App.* at 269, 303. Kleaving did not offer Dr. Holsworth's testimony or report during the July 2012 trial or make any offer of proof.

The jury acquitted Kleaving on the insurance fraud charge but found her guilty of conspiracy to commit murder. At the conclusion of the sentencing hearing, the trial court identified as aggravating circumstances Kleaving's lack of remorse and that a reduced sentence would depreciate the seriousness of the crime. "Were it not for Indiana State Police intervention in this case, this case could very well have resulted in a homicide." *Sent. Hr'g Tr.* at 103. The trial court recognized as mitigating factors that Kleaving did not have a criminal history and that she had mental health issues. Ultimately, the trial court determined that the advisory thirty-year sentence for the Class A felony was just and appropriate. Kleaving now appeals.

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

Kleaving contends that the evidence was not sufficient to support a conspiracy to commit murder conviction. To convict Kleaving of conspiracy to commit murder, the State

8

had to prove that, while having the intent to commit murder, Kleaving entered into an agreement to commit murder and she performed an overt act in furtherance of the agreement. Ind. Code § 35-41-5-2; *Dickenson v. State*, 835 N.E.2d 542, 549 (Ind. Ct. App. 2005), *trans. denied*. Conspiracy to commit murder requires proof of an agreement, but not necessarily of a killing. *Smith v. State*, 655 N.E.2d 532, 546 (Ind. Ct. App. 1995), *trans. denied*. On appeal, Kleaving concedes that "[she] objectively exhibited the intent to have McPherson killed," and she does not challenge the existence of an agreement or overt act in furtherance of it; rather, she maintains that "[she] is not culpable because she was entrapped." *Appellant's Br*. at 8.

When we review a claim of entrapment, we use the same standard that applies to other challenges to the sufficiency of evidence. *Lahr v. State*, 640 N.E.2d 756, 760 (Ind. Ct. App. 1994), *trans. denied*.

> We consider only the evidence that supports the verdict, and we draw all reasonable inferences from that evidence. We will neither reweigh the evidence nor judge the credibility of witnesses. We will uphold a conviction if the record supports it with substantial evidence of probative value from which a reasonable trier of fact could infer that the appellant was guilty beyond a reasonable doubt.

*Ferge v. State*, 764 N.E.2d 268, 270 (Ind. Ct. App. 2002).

Indiana Code section 35-41-3-9 defines the defense of entrapment and provides:

(a) It is a defense that:

(1) the prohibited conduct of the person was the product of a law enforcement officer, or his agent, using persuasion or other means likely to cause the person to engage in the conduct; and

(2) the person was not predisposed to commit the offense.

9

(b) Conduct merely affording a person an opportunity to commit the offense does not constitute entrapment.

*Ferge*, 764 N.E.2d at 271. When an accused raises this defense, the prosecution must prove that he was not innocently lured and enticed into the criminal activity. *Williams v. State*, 274 Ind. 94, 97, 409 N.E.2d 571, 574 (Ind. 1980). The defense of entrapment turns upon the defendant's state of mind, or whether the criminal intent originated with the defendant. *Kats v. State,* 559 N.E.2d 348, 353 (Ind. Ct. App. 1990), *trans. denied*.

The defense of entrapment may be rebutted by showing the defendant had a predisposition to commit the crime. *Lahr*, 640 N.E.2d at 760. The following factors are important in determining whether a defendant was predisposed to commit the charged crime:

1) the character or reputation of the defendant, 2) whether the suggestion of criminal activity was originally made by the government, 3) whether the defendant was engaged in criminal activity for a profit, 4) whether the defendant evidenced reluctance to commit the offense, overcome by government persuasion, and 5) the nature of the inducement or persuasion offered by the government.

*Ferge*, 764 N.E.2d at 271. Whether a defendant was predisposed to commit the crime charged is a question for the trier of fact. *Id*. The State must prove the defendant's predisposition beyond a reasonable doubt. *Id.*

Kleaving argues on appeal that the police "fueled and encouraged her fear" that A.K. was going to be harmed or killed and tried to "lure" her into committing the crime. *Appellant's Br*. at 7, 14. We disagree. The record before us reveals that Kleaving became increasingly obsessed with her granddaughter, A.K. Harboring concern that the child was being abused by McPherson, Kleaving sought out advice from Hayes, a psychic reader, who

10

predicted the child's demise in 2012 if circumstances did not change. Through Hayes, Kleaving met Griepenstroh who agreed to use her private investigation skills to assist Kleaving, and who then followed and videotaped McPherson and contacted a variety of officials and media outlets on Kleaving's behalf. Eventually, Kleaving asked Griepenstroh to kill McPherson, but Griepenstroh refused. Kleaving also discussed the matter with Schneider, a family friend, who mentioned the idea that a hunting accident could be staged. Continuing on the course of eliminating McPherson, Kleaving obtained what she believed to be untraceable pre-paid cell phones, asking her Florida cousin to purchase a GoPhone and mail it to Griepenstroh, with the plan that Griepenstroh give that phone to a hit man who would have instructions to call Kleaving with it. Once she received that phone call from "Vic," who was actually Sergeant Sands, Kleaving asked "where and when" they should meet. *Tr.* at 601. Kleaving arrived at the designated location with $500 in cash, along with the title to her vehicle as additional payment. When Sergeant Sands mentioned the idea of faking a burglary to her home, for which she could later seek insurance money, Kleaving agreed and offered the idea of leaving open her husband's gun safe so that its contents could easily be accessed. During the meeting with Sergeant Sands, she suggested the idea of disposing of McPherson's body at a location called Addison's Dam, where his body would not be found. From these facts, the jury had ample evidence to find that Kleaving was predisposed to commit the crime.

Kleaving asserts that the authorities, through the conduct of Sergeant Sands, were controlling her in a number of ways. For instances, she argues, police, not Kleaving, initiated

11

the meeting, when Sergeant Sands called her on November 8. In his testimony, Sergeant Sands explained that he contacted her because he understood Kleaving was awaiting the call from the hit man. Consistent with that, the record reveals that upon receiving the phone call, Kleaving did not inquire who was calling or why. Instead, her reaction was that she was expecting the call. Further, when Sergeant Sands suggested they meet in person, her first response was "where and when." *Tr.* at 601.

Kleaving also asserts that Sergeant Sands was controlling her when she met with him a few days later on November 11 because he expressed an unwillingness to wait too long to proceed, which she claims imposed a sense of urgency upon her. Sergeant Sands testified that it was his job to determine her level of commitment and assess the threat level to another's life. For instance, he explained, if the subject is willing to pay $10,000 and figure out a way to come up with the money, he or she is serious. We recognize that at one point Kleaving expressed her thoughts that because there were pending motions regarding visitation in front of the paternity court, perhaps she should wait for a ruling, and Sergeant Sands told Kleaving it would cost her $5000 more if they waited a month or more to proceed, because that would require him to return to Texas and come back to Indiana. However, he also told her, "Well it's your decision. If the judge is going to make some type of ruling, you may not want to go through with this." *Id.* at 603. At no point did Kleaving express a desire to end the meeting or terminate the plan.

Based on the record before us, the evidence supports a finding that Kleaving was not induced to enter into this conspiracy to commit murder and that she was predisposed to do so.

The conduct of the police merely afforded her an opportunity to commit the offense and does not constitute entrapment. There was sufficient evidence to support the jury's rejection of Kleaving's entrapment defense.

## II.     Exclusion of Evidence

In January 2012, two months after Kleaving's arrest and while she was incarcerated, Dr. Holsworth met with and conducted a psychological evaluation of Kleaving. His purpose was to determine her competency to stand trial. *Sent. Hr'g Tr.* at 50. Prior to trial, Kleaving disclosed that she intended to present Dr. Holsworth's testimony and report in support of her entrapment defense, arguing that his report was relevant to her state of mind, specifically that she suffered from diminished mental capacity and a fragile mental state, which made her especially susceptible to the idea and suggestion that McPherson be killed. The State's motion in limine to exclude the evidence, which the trial court granted, asserted that the report contained self-serving, hearsay statements, was based on Kleaving's state of mind after the crime had been committed, and was not relevant because Kleaving did not file an insanity defense. Kleaving now asserts that the trial court erred when it excluded Dr. Holsworth's testimony and report because it would have supported her theory that she "did not have the requisite state of mind to be guilty of the alleged conspiracy." *Appellant's Br.* at 10.

A trial court is accorded discretion in ruling on the relevancy and admissibility of expert evidence. *Schmidt v. State*, 816 N.E.2d 925, 937 (Ind. Ct. App. 2004), *trans. denied*.

13

We will not reverse a trial court's decision absent an abuse of discretion, that is, where the decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

In this case, Kleaving offered the report at the hearing on the motion in limine, but made no offer of proof during trial. "Rulings on motions in limine are not final decisions and, therefore, do not preserve errors for appeal." *Swaynie v. State,* 762 N.E.2d 112, 113 (Ind. 2002). Because Kleaving did not attempt to introduce the evidence at trial or otherwise make an offer to prove, she has waived the issue. *Id*; *see also Black v. State,* 829 N.E.2d 607, 610 (Ind. Ct. App. 2005), *trans. denied* (holding that defendant failed to preserve issue for appeal where he failed to request relief from trial court's ruling on State's motion in limine).

### III.   Sentencing

Following a sentencing hearing, the trial court imposed the advisory thirty-year sentence for Kleaving's Class A felony conviction. Ind. Code § 35-50-2-4 (sentence range is twenty to fifty years, with advisory sentence being thirty); *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). We initially observe that sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Gleason v. State*, 965 N.E.2d 702, 710 (Ind. Ct. App. 2012) (citing *Anglemyer v. State,* 868 N.E.2d 482, 490 (Ind. 2007)). An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* The trial court can abuse its discretion by (1) issuing an inadequate sentencing statement, (2) finding aggravating or mitigating factors that are not supported by the record, (3) omitting factors that are clearly

14

supported by the record and advanced for consideration, (4) or by finding factors that are improper as a matter of law. *Gleason*, 965 N.E.2d at 710 (citing *Laster v. State*, 956 N.E.2d 187, 193 (Ind. Ct. App. 2011)).

Here, Kleaving challenges her sentence in several respects, arguing that (1) the trial court did not enter a sentencing statement, (2) the trial court failed to consider a significant mitigating circumstance, and (3) the sentence is inappropriate. We consider each in turn.

## A. Sentencing Statement

Trial courts are required to enter sentencing statements when imposing a sentence for a felony offense. *Gleason*, 965 N.E.2d at 710 (citing *Anglemeyer*, 868 N.E.2d at 490). Certain requirements for the sentencing statement exist:

> The statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. If the trial court includes aggravating or mitigating circumstances in its sentencing statement, it must identify all of the significant circumstances and "explain why each circumstance has been determined to be aggravating or mitigating."

*Id*. (internal citations omitted).

Here, the trial court issued a written Order on Sentence, in which the trial court stated it had considered Kleaving's lack of a prior criminal record and the pre-sentence investigation report. Kleaving asserts that the Order "did not identify any specific mitigators or aggravators . . . nor did it explain why each factor was aggravating or mitigating," and therefore, the trial court failed to issue "an appropriate sentencing statement," which requires us to remand for resentencing. *Appellant's Br*. at 24-25.

15

Upon review of the record before us, we disagree. When reviewing the sufficiency of the sentencing statement, we examine both the trial court's written and oral statements. *Gleason*, 965 N.E.2d at 710. At the sentencing hearing, the trial court identified Kleaving's lack of remorse, and her pattern of "continuously blaming others," as an aggravating circumstance. *Sent. Hr'g Tr.* at 103-04. The trial court also observed that "[t]his is a very serious crime," and "[w]ere it not for Indiana State Police intervention in this case, this case could very well have resulted in a homicide," identifying as an aggravator "that a reduced sentence would depreciate the seriousness of the crime." *Id.* The trial court identified as mitigating factors that Kleaving had no criminal history of any kind and that Kleaving suffered from mental health issues. We find that the trial court's Order and oral sentencing statement were sufficiently detailed to support the imposition of the thirty-year advisory sentence.

## B. Failure to Find Mitigator

One of the factors that a trial court may consider as a mitigating factor is whether imprisonment of the person will result in undue hardship to the person or the dependents of the person. Ind. Code § 35-38-1-7.1(b)(10). Kleaving asserts that the trial court failed to consider as a mitigating circumstance that her husband, Kevin, would suffer hardship if she was sentenced to an extended period of incarceration.

When a defendant offers evidence of mitigators, the trial court has the discretion to determine whether the factors are indeed mitigating, and the trial court is not required to explain why it does not find the proffered factors to be mitigating. *Patterson v. State*, 846

16

N.E.2d 723, 727 (Ind. Ct. App. 2006). An allegation that the trial court failed to identify or find a mitigating factor requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Flickner v. State*, 908 N.E.2d 270, 273 (Ind. Ct. App. 2009).

Here, at sentencing, Kevin testified that he has been owner and proprietor of a heating and air conditioning business for thirty years. He and Kleaving are the only employees, with Kevin handling all the manual labor and Kleaving being solely responsible for all the bookkeeping, scheduling, and paperwork. He testified that, during Kleaving's incarceration, he was falling behind in scheduling, was having difficulty keeping up with the business, and was considering closing it. He further noted that he and Kleaving had been married thirty-two years and, since her absence, he was having difficulty eating and sleeping. On appeal, Kleaving urges us to find that his testimony establishes that an extended sentence in the Department of Correction imposes a substantial hardship on him and his livelihood.

As the State asserts, many defendants have family members, such as children or spouses, who are burdened by the defendant's incarceration. There was no evidence presented that Kleaving was the only person who could perform the managerial duties of the family business, and Kleaving has not demonstrated that any hardship suffered by Kevin is "undue" in the sense that it is any worse than that suffered by other dependents. The trial court did not abuse its discretion in not finding undue hardship to be a mitigating factor.

17

## C.    Inappropriate Sentence

Kleaving argues that her sentence of thirty years was inappropriate in light of the nature of the offense and her character. We may revise a sentence after careful review of the trial court's decision if we conclude that the sentence is inappropriate based on the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Reid*, 876 N.E.2d at 1116; *McMahon v. State*, 856 N.E.2d 743, 749 (Ind. Ct. App. 2006). Even if the trial court followed the appropriate procedure in arriving at its sentence, the appellate court still maintains a constitutional power to revise a sentence it finds inappropriate. *Hope v. State*, 834 N.E.2d 713, 718 (Ind. Ct. App. 2005). Nevertheless, the reviewing court "must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). Further, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts . . . but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Here, Kleaving argues that the thirty-year sentence was excessive and that the nature of the offense and her character warrant an executed sentence of less than the advisory, or else suspension of part of her sentence to probation, which would include a community corrections program.

With regard to the nature of the offense, Kleaving argues that "there was no actual, physical harm done to anyone in this case. All involved, other than Kleaving and husband, are free to go about their daily lives, virtually unaffected and unhindered." *Appellant's Br.* at 26. We disagree. Believing that McPherson abused her granddaughter, Kleaving devised and acted upon a plan to eliminate McPherson. Over a period of at least two months, Kleaving purchased pre-paid cell phones, she asked various persons to kill McPherson for her, she obtained cash, met with someone she believed was a hit man and provided him with information about where and how to locate McPherson, and she suggested a remote location where his body could be disposed of and not found. Kleaving has not established that the nature of the offense warrants a finding that her advisory sentence is inappropriate.

Concerning the character of the offender, Kleaving notes that this was her first and only criminal offense, and that she has raised two children and helped her husband of thirty-two years run the family business, performing all of the necessary office and accounting work. Kleaving asserts that her mental problems "caused and allowed" her behavior toward McPherson to persist, but that she "is not someone who is [a] threat to society." *Appellant's Br.* at 27. As to the latter proposition, we must disagree. Kleaving showed no remorse for the crime and, although family and friends encouraged her to allow the paternity court to handle the allegations of abuse and determine appropriate visitation, she did not follow that advice, and rather, she was prepared to pay to have McPherson murdered. This, we find, constitutes a threat to society.

Under the facts before us, we find that Kleaving's thirty-year advisory sentence is not inappropriate. *Reid*, 876 N.E.2d at 1117 (where supreme court reduced fifty-year sentence for conspiracy to commit murder to advisory sentence of thirty years, where victims pleaded for leniency, no one was injured, and defendant had history of mental health problems).

Affirmed.

VAIDIK, J., and PYLE, J., concur.